UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| J.D. IRVING, LTD., <br>            Plaintiff, <br><br> v. <br><br> UNITED STATES, <br>            Defendant. | Court No. 21-00641 |

**<u>DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS</u>**

Defendant, the United States, respectfully submits this reply in support of its motion to dismiss. ECF No. 16.

J.D. Irving seeks to avoid paying current cash deposits at the rate assigned in the second administrative review and tries to frame its request as a novel one that requires special consideration because of the procedural specifics of the case, as well as the involvement of a binational panel. United States – Mexico – Canada Agreement Art. 10.12, U.S.-Mex.-Can, Nov. 30, 2018 (entered into force July 1, 2020) (USMCA). But Commerce's issuance of liquidation instructions implementing the cash deposit rate from the most recently completed review is not a novel issue, nor is it an issue within the Court's 28 U.S.C. 1581(i) jurisdiction. It is not novel because it is exactly how the statute is supposed to function. And it does not fall with the Court's section 1581(i) jurisdiction because J.D. Irving can pursue its claims under 1581(c) and recover all of its cash deposits paid, with interest, if it prevails.

I. **All Of J.D. Irving's Suspended Entries, Both Past and Current, Can Be Refunded Under Section 1581(c)**

As an initial matter, because Commerce has a retrospective review system, J.D. Irving

1

can be refunded for any overpayment of cash deposits that are found to be improper. Specifically, all imports that enter the United States after an affirmative determination of sales at less than fair value are subject to cash deposits for security purposes at the rate determined in the final determination. 19 U.S.C. § 1673b(d)(1)(B); 19 U.S.C. § 1673d(c)(1)(B)(ii); *see also* 19 CFR § 351.211(a) ("Generally, upon the issuance of an order, importers no longer may post bonds as security for antidumping or countervailing duties, but instead must make a cash deposit of estimated duties.") Each year, on the anniversary date of the antidumping duty order, parties may request an administrative review of their entries to determine whether the dumping margin has changed. 19 U.S.C. § 1675(a). Upon issuance of a final administrative review determination, Commerce takes two actions: (1) for future entries, it sets a new cash deposit rate, if necessary, that reflects the rate determined in the administrative review. 19 U.S.C. § 1675(a)(2)(C). The cash deposit rates for each company will remain in effect until a final determination of a subsequent administrative review is issued. And, (2) the specific entries that were reviewed in the administrative proceeding will be liquidated (*i.e.*, assessed final duties) at the rates determined in the administrative review, unless challenged and an injunction against liquidation is issued, or, for USMCA cases, parties request continued suspension of liquidation. *Id.*; 19 U.S.C. § 1516a(c)(2); 19 U.S.C. § 1516a(g)(5)(C). Once the litigation is completed, the entries at issue are liquidated in accordance with the litigation results. 19 U.S.C. § 1675(a)(3)(C).

Accordingly, J.D. Irving's entries from the second administrative review remain suspended pursuant to J.D. Irving's request for continued suspension and will be liquidated at the conclusion of, and in accordance with, the USMCA binational panel review. 19 U.S.C. § 1675(a)(3)(C) ("In a case in which a final determination . . . is under review under [§ 1516a]

and a liquidation of entries covered by the determination is . . . suspended under [§ 1516a(g)(5)(C)], the administering authority shall, within 10 days after the final disposition of the review under [§ 1516a], transmit to the Federal Register for publication the final disposition and issue instructions to the Customs Service with respect to the liquidation of entries pursuant to the review."). For J.D. Irving's current entries, for which J.D. Irving is paying the contested cash deposit rate, J.D. Irving may request an administrative review of the entries, in which case Commerce will conduct an administrative review and determine a final antidumping duty rate.

This matter is thus no different than any other in which a party believes its cash deposit rate should be lower: a party may either challenge the final results upon which the cash deposit instructions are based (in which case Commerce will update the cash deposit instructions if it reaches a new decision not in harmony with the final results), or request an administrative review of the suspended entries for which the cash deposits are paid.

J.D. Irving asserts that we have missed their point and that we "wrongly contend[] that Plaintiff could obtain adequate relief through USMCA panel review." Pl. Resp. at 10. To the contrary, the only relief we assert J.D. Irving could obtain at the USMCA is review of Commerce's determination in the *2019 Final Results*. This point is not contested: J.D. Irving's response concedes as much. Pl. Resp. at 11 (conceding that the USMCA panel has the "ability to review" the "the results of the second administrative review – where J.D. Irving was assigned the 11.59 percent rate it now contests…") (quoting Def. Mot. at 7). But Commerce decided the issue that J.D. Irving attempts to contests *in the* 2019 Final Results. See IDM at 41-42 ("[C]onsistent with the [statute], our regulations, and numerous rulings by the courts, we have assigned J.D. Irving a cash deposit rate based on the non-selected companies' rate determined for these final results.").

The true nature of J.D. Irving's complaint is thus twofold: it is a challenge to the issue it raised in the second administrative review—that Commerce ruled upon and that is now on review with a binational panel; and it is also a challenge to the cash deposit rate currently being applied to new entries– one that J.D. Irving can raise in the context of an administrative review covering *those entries* at the appropriate time. See *Norsk Hydro Canada, Inc. v. United States*, 472 F.3d 1347, 1355 (Fed. Cir. 2006) ("As we have noted, 'mere recitation of a basis for jurisdiction, by either a party or a court, cannot be controlling ... we look to the true nature of the action in the district court in determining jurisdiction of the appeal.'") (citation omitted).

J.D. Irving knows all this, but does not wish to wait for the completion of these statutorily prescribed administrative and judicial processes. Section 1581(i) is not intended for impatient parties. See *Valeo N. Am., Inc. v. United States*, 277 F. Supp. 3d 1361, 1366 (Ct. Int'l Trade 2017) (1581(i) jurisdiction does not attach over claims that can be brought in the future under 1581(c)). J.D. can obtain the relief it seeks through the binational challenge and any additional administrative review challenges; the Court, therefore, lacks jurisdiction under section 1581(i) to provide J.D. Irving with immediate relief.

J.D. Irving disagrees, repeatedly claiming that is does not seek to contest the *2019 Final Results* but rather the *instructions* to CBP implementing those results, *i.e.* instructing CBP to collect cash deposits in accordance with the findings of that result going forward. Pl. Resp. at 10. It attempts to create a distinction where none exists: Commerce's instructions to CBP implementing Commerce's determination are not – in and of themselves – a separate determination. J.D. Irving seeks to couch its disagreement with the *2019 Final Results* in the guise of a "novel" legal theory – but there is nothing novel about an importer paying cash deposit rates in accordance with a final determination from Commerce while simultaneously challenging

those results.  *Valeo*, 277 F. Supp. 3d at 1366; quoting *MacMillan Bloedel Ltd. v. United States*, 16 CIT 331, 333 (1992) ("paying deposits pending court review is an ordinary consequence of the statutory scheme.")

The sheer fact that J.D. Irving seeks to avoid the very same business decision other importers make every day – whether to seek review in a subsequent administrative review without knowing whether the rate assigned in the prior review will be upheld – yet can point to no instance where this Court has even considered such a question (let alone ruled as plaintiff asks) illustrates that plaintiff seeks relief the Court cannot grant.

## II.   The Court's Injunctive Powers Do Not Extend To Actions Contrary To Statute

As for the merits of J.D. Irving's request for immediate relief, J.D. Irving ignores the statute and the relief available to it.  As we have just established, pursuant to statute, Commerce issues updated cash deposit instructions at the conclusion of an administrative review, and those cash deposit instructions remain in effect even if the administrative review is subject to litigation before this Court (or a USMCA panel).  Although this Court routinely issues statutory injunctions enjoining the *liquidation* of entries, the statute does not direct the Court to enjoin Commerce from instructing CBP to collect cash deposits at a certain rate.  *See* 19 U.S.C. § 1516a(c)(2) (providing, as injunctive relief, that the Court of International Trade "may enjoin the *liquidation* of some or all entries of subject merchandise covered by a determination . . ." (emphasis added)).  Notably, J.D. Irving's response to our motion *does not cite a single instance* where this Court enjoined the future collection of a cash deposit.

J.D. Irving *does* rely significantly on this Court's in decision *Cooper Tire & Rubber Co. v. United States*.  217 F. Supp. 3d 1373, 1374 (Ct. Int'l Trade 2017), for the proposition that the Court can provide the immediate relief it seeks here.  But *Cooper Tire* – concerning the

calculation of a rate (separate from the duty margin) in the context of an investigation – is inapposite.  In *Cooper Tire*, Commerce initiated parallel antidumping (AD) and countervailing duty (CVD) investigations over tires for passenger cars and light trucks from China.  *Id.* at 1375.  Though Commerce did not select the plaintiff, Cooper, as an individual respondent in the AD investigation, Commerce determined that it was not part of the China-wide entity but rather entitled to a separate rate.  *Id.*  Cooper, however, *was* selected as a mandatory respondent in the parallel CVD investigation.  *Id.*  Commerce ultimately assigned Cooper (and all other respondents entitled to a separate rate but not individually reviewed in the AD investigation) a dumping margin that was the average of the margins found for the two mandatory respondents: 25.84%.  *Id.*  However, pursuant to 19 U.S.C. § 1677a, Commerce made two downward adjustments to that margin, subtracting the percentage of the "export subsidy rate" as calculated in the CVD investigation, as well as a percentage "to account for the estimated domestic subsidy pass-through."  *Id.*  Because Cooper was individually examined in the CVD investigation, Commerce used its individually-calculated "export subsidy rate" (11.13%) in making the downward adjustment to Cooper's rate, while giving the other separate rate respondents a downward adjustment of 13.53% based on the "all others" export subsidy rate in the CVD investigation.  *Id.*  The result was that Cooper – by virtue of having been individually reviewed in the CVD investigation but not the AD investigation – was given a higher cash deposit rate (11.12%) than the rest of the separate rate respondents (8.72%).  *Id.*

      Cooper appealed to this Court, asserting that Commerce's determination to treat it differently from the other entities receiving a separate rate was arbitrary and capricious.  *Id.*  The Court concluded that Commerce's determination was not in accordance with law because it treated Cooper differently from other separate rate respondents and the "basis for the different

treatment was the Department's selection of Cooper as a mandatory respondent in the parallel countervailing duty investigation" which "provided Commerce with data from which it could calculate, at 11.13%, a percentage for the export subsidy adjustment that was individual to" Cooper. *Id.* at 1380. Finding that the cash deposit rate was based "upon a method of determining an estimated antidumping duty rate that was unrelated to Cooper's future antidumping duty liability," this Court held that the cash deposit rate assigned by Commerce lacked a rational basis. *Id.* ("While Commerce had a *basis* for treating Cooper differently, it was not a *rational* basis because it relied upon a method of determining an estimated antidumping duty rate that was unrelated to Cooper's future antidumping duty liability.") (emphasis in original).

As this Court explained, pursuant to 19 U.S.C. § 1673d(c)(1)(B)(ii), cash deposit rates assigned during an investigation act as "security" for potential antidumping duty liability, and "the statutory scheme distinguishes between individually investigated respondents and all other respondents." *Id.* (Under 19 U.S.C. § 1673d(c)(1)(B)(ii), Commerce "shall order the posting of a cash deposit, bond, or other security, as [Commerce] deems appropriate, for each entry of the subject merchandise in an amount based on the estimated weighted average dumping margin or the estimated all-others rate, *whichever is applicable*.") (emphasis in original). Importantly, the Court drew a distinction between a cash deposit rate assigned in an investigation (an "'estimated' rate, which is an estimate of the potential antidumping duty liability"), and "the actual antidumping duty" which is "ordinarily is determined upon completion of an administrative review of the order…." *Id.* at 1381. As the Court explained, the "hybrid" approach taken by Commerce – with Cooper individually examined in the CVD investigation but given the all others separate rate in the AD investigation – would not be repeated in subsequent administrative

reviews: Cooper would either be individually reviewed, and thus receive a rate wholly specific to it, or would receive the separate rate for non-individually examined companies which (in an administrative review, as opposed to an investigation) would not include any adjustment for export subsidies.[1]  *Id.* (*"Unlike in administrative reviews*, the Department calculates the adjustment for export subsidies in investigations not in the margin-calculation program, but in the cash-deposit instructions issued to CBP.") (quoting Final AD Determination, 80 Fed. Reg. at 34,897 n.12) (emphasis in original).  Having found that the cash deposit rate assigned by Commerce did not reflect "an estimate of the future antidumping duty liability," this Court rejected the cash deposit rate assigned by Commerce.  *Id.* at 1383.

*Cooper Tires* is inapposite.  First, the cash deposit rate that plaintiff contests was assigned in an administrative review, not an investigation; it is thus an "actual antidumping duty" which "ordinarily is determined upon completion of an administrative review of the order."  *Id.* at 1381.  Because investigation rates are "estimates," the cash deposit rates in *Cooper Tire* were adjusted pursuant to statutory provisions providing for those adjustments; the Court thus reviewed whether Commerce's application of those statutory provisions had a rational basis.  *Cooper Tires*, 217 F. Supp at 1381 (citing 19 U.S.C. § 1673d(c)(1)(B)(ii)).  No such statutory provision exists here: there is no distinction between the question of whether the cash deposit rate assigned in the second administrative review is supported by substantial evidence and whether Commerce's determination to assign a given antidumping duty rate is supported by substantial evidence – they are one in the same.  Moreover, plaintiff does not assert that it was treated differently from other similarly-situated respondents, as in *Cooper Tires*; rather, it *seeks to*

---

[1] In a third possibility, Cooper could also be found not to be separate from the Chinese government and would therefore receive the China-wide entity rate.

*receive different treatment* from other respondents, continuing to benefit from the lower cash deposit rate assigned in the first administrative review and carried forward to the third (while the second administrative review was underway).

Finally, J.D. Irving asserts that its "claim before this Court will not nullify USMCA dispute resolution of the 2019 Review Final Results" nor will Plaintiff's claim "have any bearing on adjudication of the issues raised in the USMCA panel proceeding." Pl. Resp. at 12.  But J.D. Irving overlooks the potential result of conflicting decisions from the two bodies.  For example, if this Court were to agree with J.D. Irving's legal theory and find in its favor, this Court would (presumably) order that the 1.57% rate initially assigned to 2020 entries be retroactively applied to all 2020 entries.  At the same time, if the USMCA panel upholds Commerce's determination in the 2019 review, then Commerce will be empowered to continue applying the rate found in that review – 11.59%.  As we have explained, it is Commerce's practice (and consistent with statue) that an importer's cash deposit rate is the rate assigned in the most recently completed administrative review.  The two decisions would thus be at odds, with this Court ordering that J.D. Irving is entitled to a 1.57% cash deposit rate, and the USMCA panel affirming Commerce's final determination in the 2019 review, pursuant to which Commerce assigned a 11.59% rate going forward.  And this potential conflict only underscores the central assertion in our motion: the assignment of a rate in a completed administrative review is not separate from Commerce's analysis to arrive at that rate, and the application of that rate to subsequent entries while the final results are subject to judicial review is not an injury this Court can redress.

## CONCLUSION

For these reasons, as well as those set forth in our motion to dismiss, this Court should dismiss the complaint filed by J.D. Irving.

9

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | BRIAN M. BOYNTON<br>Principal Deputy Assistant Attorney General |
|  | PATRICIA M. MCCARTHY<br>Director |
|  | /s/ Claudia Burke<br>CLAUDIA BURKE<br>Assistant Director |
| OF COUNSEL:<br>PAUL K. KEITH<br>Senior Attorney<br>U.S. Department of Commerce<br>Office of the Chief Counsel for Trade<br>   Enforcement and Compliance<br>1401 Constitution Avenue, NW<br>Washington, D.C. 20230<br>Tel: (240) 449-5852<br>Email: paul.keith@trade.gov | /s/Kelly a. Krystyniak<br>KELLY A. KRYSTYNIAK<br>Trial Attorney<br>U.S. Department of Justice<br>Civil Division<br>Commercial Litigation Branch<br> P.O. Box 480<br>Ben Franklin Station<br>Washington D.C. 20044<br>Tel: (202) 307-0163<br>Fax: (202) 514-8640<br>Email: Kelly.a.krystyniak@usdoj.gov |
| Dated:  April 4,  2022 | Attorneys for Defendant |

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this brief complies with the Court's type-volume limitation rules.  According to the word count calculated by the word processing system with which the brief was prepared, this brief contains a total of 2,957 words.

s/ Kelly A. Krystyniak

April 4, 2022